**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

THE HANOVER INSURANCE
COMPANY, a New Hampshire corporation,

        Plaintiff,

v.                                         Case No. 2:09-cv-14200

GIANNOLA MASONRY CO., a Michigan        Hon. Marianne O. Battani
corporation, ANTONINO INDEMNITY
GIANNOLA, an individual, PATRICIA
ANDROMACHI INDEMNITY
GIANNOLA, an individual, MICHELE
BIUNDO, an individual, and MARIA
BIUNDO, an individual,

        Defendants.

---

**THE HANOVER INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff, The Hanover Insurance Company ("Hanover") by its attorneys, Kerr, Russell and Weber, PLC, and for its Motion requests summary judgment as to all Defendants pursuant to Fed.R.Civ.P. 56. In support of its Motion, Hanover relies on the attached brief and exhibits.

Pursuant to Local Rule 7.1(a), Hanover certifies that it contacted the counsel of all Defendants to ascertain whether the motion would be opposed and the parties held a conference on May 27, 2010 between attorneys in which the movant explained the nature of the motion or request and its legal basis and requested but did not obtain concurrence in the relief sought. It is therefore necessary to bring this motion.

Respectfully submitted,

**KERR, RUSSELL AND WEBER, PLC**

By:  s/Michael D. Carroll_____ _____
      Mark M. Cunningham (P38408)
      Michael D. Carroll (P53815)
      Jacquelyn A.K. Stanyer (P69403)
Attorneys for Plaintiff The Hanover Insurance Company
500 Woodward Ave., Suite 2500
Detroit, MI  48226
(313) 961-0200
mmc@krwlaw.com
mdc@krwlaw.com
Dated:  May 28, 2010          jas@krwlaw.com

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THE HANOVER INSURANCE
COMPANY, a New Hampshire corporation,

       Plaintiff,

v.                                         Case No. 2:09-cv-14200

GIANNOLA MASONRY CO., a Michigan        Hon. Marianne O. Battani
corporation, ANTONINO INDEMNITY
GIANNOLA, an individual, PATRICIA
ANDROMACHI INDEMNITY
GIANNOLA, an individual, MICHELE
BIUNDO, an individual, and MARIA
BIUNDO, an individual,

       Defendants.

---

## BRIEF IN SUPPORT OF THE HANOVER INSURANCE COMPANY'S
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED.................................................................................... iii

TABLE OF MOST APPROPRIATE AUTHORITY ................................................................. iv

INDEX OF EXHIBITS ............................................................................................................. vi

INTRODUCTION ....................................................................................................................... 1

STATEMENT OF FACTS .......................................................................................................... 1

ARGUMENT ............................................................................................................................... 5

      A.     Summary Judgment Standard. ................................................................................. 5

      B.     Hanover is Entitled to Summary Judgment Against the Indemnitors with
             Respect to Count I, Breach of Contract. ................................................................. 6

             1.     It is Undisputed that Defendants Giannola Masonry Company,
                    Antonino Giannola, Patricia Andromachi Giannola, and Michele
                    Biundo are Bound by the Indemnity Agreement. ...................................... 7

             2.     The Evidence Shows that Maria Biundo Permitted her Husband,
                    Michele Biundo, to Sign her Name to the Indemnity Agreement. ............. 7

             3.     The Indemnity Agreement Applies to the Bonds at Issue. ...................... 11

      C.     Hanover is Entitled to Summary Judgment Against the Indemnitors with
             Respect to Count II, Exoneration and *Quia Timet*................................................ 16

      D.     Hanover is Entitled to Summary Judgment Against the Indemnitors with
             Respect to Count III, Specific Performance of the Indemnity Agreement,
             and Count V, Declaratory Judgment.................................................................... 18

CONCLUSION AND REQUEST FOR RELIEF....................................................................... 19

## STATEMENT OF ISSUES PRESENTED

1.  Is Hanover entitled to summary judgment against Defendants Giannola Masonry Company, Antonino Giannola, Patricia Andromachi Giannola, and Michele Biundo where there is no dispute that each of these Defendants signed the Agreement of Indemnity, Hanover executed various payment and performance bonds in reliance upon the Agreement of Indemnity, and numerous claims have been both asserted and paid in connection with those bonds?

2.  Is Hanover entitled to summary judgment against Defendant Maria Biundo where the evidence shows that she permitted her husband, Michele Biundo, to sign her name to the Agreement of Indemnity, Hanover executed various payment and performance bonds in reliance upon the Agreement of Indemnity, and numerous claims have been both asserted and paid in connection with those bonds?

## TABLE OF MOST APPROPRIATE AUTHORITY

<u>Cases</u>

*Beard v. Hill*,
    131 Mich. 246; 90 N.W. 1065 (1902) ...................................................................... 8

*Burkhardt v. Bailey*,
    260 Mich. App. 636, 656; 680 N.W.2d 453 (2004) .............................................. 6

*Ciminillo v. Streicher*,
    434 F.3d 461, 464 (6th Cir. 2006) ........................................................................ 6

*David v. Serges*,
    373 Mich. 442; 129 N.W.2d 882 (1964) ............................................................. 14

*Ellus v. Phillips*,
    363 Mich. 587; 110 N.W.2d 772 (1961) ............................................................. 18

*Grand Trunk Western R., Inc. v. Auto Warehousing Co.*,
    262 Mich. App. 345, 350; 686 N.W.2d 756 (2004) .............................................. 6

*Hatch v. Wolack*,
    316 Mich. 258; 25 N.W.2d 191 (1946) ........................................................... 8, 12

*Hutton v. Roberts*,
    182 Mich. App. 153; 451 N.W.2d 536 (1989) ..................................................... 14

*James v. Alberts*,
    464 Mich. 12; 626 N.W.2d 158 (2001) .............................................................. 12

*Le Gere v. New Millenium Homes, Inc.*,
    No. 242473, 2003 Mich. App. LEXIS 3416, at *1 (2003) ................................ 9, 12

*Maryland Casualty* ...................................................................................................... 16

*Maryland Casualty Co. v. Moon*,
    231 Mich. 56; 203 N.W. 885 (1925) ................................................................... 14

*Meretta v. Peach*,
    195 Mich. App. 695; 491 N.W.2d 278 (1992) ..................................................... 13

*Milwaukie Constr. Co. v. Glenns Falls Ins. Co.*,
    367 F.2d 964 (9th Cir. 1966) .............................................................................. 18

*Penske Truck Leasing, L.P. v. Kinnie-Annex Cartage Co.*,
    No. 05-70748, 2006 U.S. Dist. LEXIS 14489, at *9
    (E.D. Mich. March 15, 2006) ............................................................................. 10

*Persinger v. Holst*,
  248 Mich. App. 499; 639 N.W.2d 594 (2001) ....................................................... 13

*Revitzer v. Trenton Med. Ctr., Inc.*,
  118 Mich. App. 169; 324 N.W.2d 561 (1982) ....................................................... 13

*Richard L. Bowen & Assoc., Inc. v. 1200 West Ninth Street Ltd. Partnership*,
  107 Ohio App. 3d 750; 669 N.E.2d 500 (1995) .................................................... 16

*St. Clair Intermediate School District v. Intermediate Educ. Ass'n/Michigan Educ. Ass'n*,
  458 Mich. 540; 581 N.W.2d 707 (1998) ............................................................... 13

*T.E. Doster v. Continental Casualty Co.*,
  268 Ala. 123; 105 So.2d 83, 86 (1958) ................................................................. 19

*The Hanover Ins. Co. v. Smith*,
  137 Ill. 2d 304; 561 N.E.2d 14 (1990) .................................................................. 16

*Transamerica Ins. Co. v. Bloomfield*,
  401 F.2d 357 (6th Cir. 1968)............................................................................... 7

*United States v. United Pacific Ins. Co.*,
  697 F. Supp. 378 (D. Idaho, 1988).......................................................................... 17

*Wentworth v. Process Installations, Inc.*,
  122 Mich. App. 452; 333 N.W.2d 78 (1983) .................................................. 8, 12

*Zurich Ins. Co. v. CCR & Co.*,
  226 Mich. App. 599, 604;  576 N.W.2d 392 (1997) .............................................. 6

## **Statutes**

28 U.S.C. § 2201............................................................................................................. 20

## **Rules**

Fed.R.Civ.P. 56................................................................................................................. 1

Fed.R.Civ.P. 56(e)(2)........................................................................................................ 6

Federal Rule of Civil Procedure 56(c)(2) ......................................................................... 5

Local Rule 7.1(a) .............................................................................................................. 1

## <u>INDEX OF EXHIBITS</u>

Agreement of Indemnity, July 12, 2005……………………………………...…………………..A

Performance and Payment Bonds for Delta Dental Project …………….…………………..….B

Performance and Payment Bonds for Kment Project………………………………………..….C

Performance and Payment Bonds for Simpson Project…………………………………..……..D

Performance and Payment Bonds for Bobcean Project………………….…………….…..……E

Deposition Transcript of Antonino Giannola, April 22, 2010…………………………...……..F

Deposition Transcript of Patricia Andromachi Giannola, April 22, 2010………………….…..G

2001 Annual Report of Giannola Masonry Company……………………………………….....H

Waivers of Liens………………………………………………………………………..…….I

Sworn Statements………………………………………………………………………..…..J

Affidavit of William E. Sanford, III………………………………………………………..…K

Deposition Transcript of Maria Biundo, March 11, 2010…………………………………...…..L

Deposition Transcript of Michele Biundo, March 11, 2010………………………….……..…M

Note and Security Agreement, April 28, 1999……………………………………………….....N

Future Advance Mortgage, September 14, 2001…………………………………………….O

Escrow Waiver Agreement, September 14, 2001………………………………………...……P

Quit Claim Deed, April 9, 2002………………………………………………………………Q

Complaint, *Biundo v. Giannola Masonry Co.*, Case No. 08-3905-CR…………………...……R

Stipulated Order Appointing Receiver, July 6, 2009………………………………….……..S

Stipulated Order of Dismissal Without Prejudice, October 20, 2009……………...………....T

Summary of Claims…………………………………………………………...……...………..U

Copies of Checks and Claim Payment Records…………………………………...………….V

General Power of Attorney, March 11, 1999……………………………………………….…….W

General Durable Power of Attorney, November 1, 2006……………………….……………..X

Bank of America Business Cardholder Statement, July 11, 2009…………………...……….…Y

Verizon Wireless Statement, October 6, 2009………………………..……………………….Z

Copies of Checks from Community Central Bank……………………………………...….AA

Warranty, March 19, 1999………………………………………………………..…………BB

Memorandum and Letters from Underwriting File…………………………………….…….CC

## INTRODUCTION

Plaintiff, The Hanover Insurance Company ("Hanover"), filed this action against Defendants Giannola Masonry Company ("Giannola" or "Giannola Masonry"), Antonino Giannola, Patricia Andromachi Giannola, Michele Biundo, and Maria Biundo (sometimes referred to collectively as "Indemnitors" or "Defendants") to enforce the terms of an Agreement of Indemnity ("Indemnity Agreement") executed by Hanover and Defendants.  Hanover seeks to compel the Indemnitors to abide by their contractual obligations to indemnify Hanover from any and all claims and to provide Hanover payment necessary to secure Hanover's obligations under bonds it furnished on behalf of Giannola as principal.  Hanover also seeks to enforce its common law right to *quia timet* relief.

## STATEMENT OF FACTS

Giannola is a Michigan corporation that was engaged in construction.  Of relevance to this case, Giannola was engaged as a contractor on four separate construction projects, one of which was private and three of which were public.  The private construction project was known as the Delta Dental Data Center Corporate Office Expansion (the "Delta Dental Project").  Consistent with a requirement of its contract, Giannola sought payment and performance bonds from Hanover.  With respect to the public projects, Giannola was engaged as a contractor on a construction project for Roseville Community Schools known as the Kment Elementary School Project (the "Kment Project"), and as a contractor on two construction projects for Flatrock Community Schools, one known as the Simpson Middle School Project (the "Simpson Project") and the other known as the Bobcean Elementary School Project (the "Bobcean Project").  Michigan law requires that public construction projects be bonded.  *See* Mich. Comp. Laws § 129.201 *et seq*.  Consistent with this requirement, Giannola sought payment and performance bonds from Hanover on these three projects.

Hanover required Defendants to execute an Indemnity Agreement prior to issuing any bonds.  On July 12, 2005, Defendants as Indemnitors executed an Indemnity Agreement in favor of Hanover, a copy of which is attached as **Exhibit A**.  Pursuant to the terms of the Indemnity Agreement, Defendants agreed jointly and severally to exonerate, indemnify and hold Hanover harmless from and against all claims and liability Hanover may incur, including losses, interest, court costs, and consultant and attorney fees as a result of having executed the Bonds.  **Exhibit A** at ¶ 2.  Moreover, Defendants are required to immediately provide Hanover with cash collateral deemed sufficient by Hanover to secure it from loss as soon as liability is asserted against Hanover.  **Exhibit A** at ¶ 3.  In reliance upon the Indemnity Agreement, Hanover, as surety, executed a payment bond and a performance bond (the "Bonds") for each of the four projects.  A copy of the Delta Dental bonds is attached as **Exhibit B**; a copy of the Kment bonds is attached as **Exhibit C**; a copy of the Simpson bonds is attached as **Exhibit D**; and a copy of the Bobcean bonds is attached as **Exhibit E**.

The depositions of the four individual Defendants have been taken.  In his deposition, Antonino Giannola testified that Giannola Masonry was created in 1976.  (Deposition Transcript of Antonino Giannola ("Dep. Antonino"), April 22, 2010, p. 5, attached as **Exhibit F**).  Antonino was the President of Giannola Masonry and had the authority to sign bonds on behalf of the company.  (*Id*., p. 6).  Antonino testified that his wife, Patricia, also had the authority to sign bonds.  (*Id*., p. 6).  Antonino discussed Patricia's authority to sign documents with Michele Biundo, and he agreed that she was able to sign when Michele was not available.  (*Id*., p. 7).  Indeed, Patricia had a history of signing bonds even well before the ones at issue here, which were issued in 2008.  (*Id*., pp. 7-8).

Patricia Giannola testified that she started working at Giannola Masonry in March 1986. (Deposition Transcript of Patricia Andromachi Giannola ("Dep. Patricia"), April 22, 2010, p. 6, attached as **Exhibit G**). Patricia worked in several areas, including payroll, accounts payable, receivables, leasing, change orders, and helped with contracts, subcontracts, and insurance certificates. (*Id.*, pp. 6-7). Patricia signed numerous documents over the course of her time with the company. (*Id.*, p. 7). She signed the company's annual report that was filed with the State of Michigan in 2001 as the Controller. (**Exhibit H**, 2001 Annual Report of Giannola Masonry Company, April 27, 2001; Dep. Patricia, p. 9). Patricia was authorized to and signed various lien waivers and sworn statements for pay applications. (**Exhibit I**, Waivers of Liens; **Exhibit J**, Sworn Statements; Dep. Patricia, pp. 10-12). Typically, either Antonino or Michele would sign the project contracts and bonds, but if they were unavailable, Patricia would call and get the authority to sign them. (Dep. Patricia, pp. 14-15). Patricia testified that she signed and initialed the Indemnity Agreement. (Dep. Patricia, pp. 24-25). Patricia also recognized Antonino's signature. (*Id.*, p. 25). Patricia testified that she and Maria had to sign documents for bonding companies and banks on occasion. (*Id.*, p. 25). Patricia could not recall ever seeing Maria sign anything at the office. (*Id.*, p. 25).

Giannola has had a number of bonding companies over the years. (Dep. Patricia, p. 16). Patricia understood that Giannola needed bonds to get public projects. (*Id.*, p. 22). Patricia was the Giannola representative who spoke with someone from Hanover after a claim was filed on the Delta Dental Project by Grand Blanc Cement. (**Exhibit K**, Affidavit of William E. Sanford, III, ¶ 9; Dep. Patricia, pp. 26-27).

Michele Biundo and Maria Biundo came to the United States in 1966. (Deposition Transcript of Maria Biundo ("Dep. Maria"), March 11, 2010, p. 14, attached as **Exhibit L;**

Deposition Transcript of Michele Biundo ("Dep. Michele"), March 11, 2010, p. 4, attached as **Exhibit M**).   In her deposition, Maria Biundo testified that she has never been employed by Giannola, and she had no understanding of her husband's position at Giannola or his ownership in the company.  (*Id*., pp. 4-5).

Maria testified that she never had to sign any bank documents for Giannola to get a loan. (Dep. Maria, p. 10).   When shown the loan documents from Community Central Bank for Giannola, Maria claimed that the signature was not hers, and she did not know who had signed her name.  (**Exhibit N**, Note and Security Agreement, April 28, 1999; Dep. Maria, pp. 10-12). Yet Maria denied that her husband ever signed her name to legal documents.  (Dep. Maria, p. 12).  When shown a future advance mortgage with her name on it, Maria claimed the signature was not hers.  (**Exhibit O**, Future Advance Mortgage, September 14, 2001; Dep. Maria, p. 12). When shown an escrow waiver agreement with her name on it, Maria claimed the signature was not hers and did not know if the signature above it was Michele's.  (**Exhibit P**, Escrow Waiver Agreement, September 14, 2001; Dep. Maria, p. 13).

Michele Biundo testified that he was the Vice President of Giannola and had a fifty percent ownership interest.  (Dep. Michele, pp. 4-5).  Michele did not remember whether his wife's signature was required from time to time on work-related documents.  (*Id*., p. 10). However, Michele agreed that the bank required Maria and Patricia to sign documents.  (*Id*., p. 11).  When shown a bank document with a signature for Maria, Michele denied that either he or Maria signed her name but admitted that his signature was next to her name.  (*Id*., pp. 11-12). Michele denied that he ever signed Maria's name to a document like this.  (*Id*., p. 12).  Michele claimed that he did not know who signed Maria's name to a quit claim deed for a piece of

property they once owned.  (**Exhibit Q**, Quit Claim Deed, April 9, 2002; Dep. Michele, pp. 15-16).

On or about September 4, 2008, Michele filed a Complaint in Macomb Circuit Court for dissolution of Giannola Masonry along with several other companies co-owned by Michele and Antonino.  (**Exhibit R**, Complaint, *Biundo v. Giannola Masonry Co.*, Case No. 08-3905-CR). The court appointed a receiver, who auctioned off the company's assets.  (**Exhibit S**, Stipulated Order Appointing Receiver, July 6, 2009).  On October 20, 2009, the case was dismissed without prejudice and the receivership terminated.  (**Exhibit T**, Stipulated Order of Dismissal Without Prejudice, October 20, 2009).  Dissolution papers have not been filed with the State.  However, Patricia testified that Giannola is currently out of business.  (Dep. Patricia, p. 22).  Michele was still at Giannola on a day-to-day basis after he filed the lawsuit to dissolve Giannola and was still working in November 2008, months after the Bonds were issued.  (*Id*., pp. 52-56).

Claims have been asserted against Giannola by suppliers and subcontractors on all four projects, which expose Hanover to liability in a sum of $623,554.66 to date as a result of having furnished the Bonds.  A summary of these claims is attached as **Exhibit U**.  To date, Hanover has paid $218,041.43 in bond claims.  (**Exhibit V**, Copies of Checks and Claim Payment Records).  Neither the Giannolas nor the company have paid anything to Hanover to reimburse it for any claims it has paid.  (**Exhibit K** at ¶ 13; Dep. Patricia, p. 27).

## ARGUMENT

### A.  Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c)(2), summary judgment must be granted where the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c)(2).  "A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving

party." *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).  A mere scintilla of evidence is not enough for the non-moving party to withstand summary judgment.  *Id*. (citation omitted). Once the moving party properly supports the motion for summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading" but must "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2).

**B.      Hanover is Entitled to Summary Judgment Against the Indemnitors with Respect to Count I, Breach of Contract.**

In Michigan, Indemnity Agreements are construed in accordance with the rules applicable to contracts in general.  *Grand Trunk Western R., Inc. v. Auto Warehousing Co.*, 262 Mich. App. 345, 350; 686 N.W.2d 756 (2004) (citations omitted).  Where the terms of a contract are unambiguous, the contract must be enforced according to those terms.  *Burkhardt v. Bailey*, 260 Mich. App. 636, 656; 680 N.W.2d 453 (2004).   "[T]he law presumes that the parties understand the import of a written contract and had the intention manifested by its terms." *Zurich Ins. Co. v. CCR & Co.*, 226 Mich. App. 599, 604;  576 N.W.2d 392 (1997) (citation omitted).

Paragraph 2 of the Indemnity Agreement provides:

The Indemnitors shall exonerate, indemnify, and save harmless the Surety from and against every claim, demand, liability, cost, charge, suit, judgment and expense which the Surety may pay or incur, including, but not limited to, loss, interest, court costs and consultant and attorneys fees:

(a) by having executed or procured the execution of the bonds; or

(b) in making an independent investigation of any claim, demand, or suit; or

(c) in defending any suit, action, mediation, arbitration or any other proceeding to obtain release from liability whether the Surety, in its sole discretion, elects to employ its own attorney or permits or requires Indemnitors to defend the Surety; or

(d) in enforcing any of the covenants, terms, and conditions of this Agreement.

(**Exhibit A** at ¶ 2).  In *Transamerica Ins. Co. v. Bloomfield*, 401 F.2d 357, 362 (6th Cir. 1968), the Sixth Circuit held that a nearly identical clause to this was unambiguous.  In addition, the Indemnity Agreement provides that as soon as liability is asserted against Hanover, whether or not it has made any payment, the Indemnitors are obligated to pay to Hanover collateral security in the amount of the claims against the bond, plus an amount deemed sufficient by Hanover in its sole discretion to indemnify and hold it harmless from and against any loss.  (**Exhibit A** at ¶ 3).

1.    **It is Undisputed that Defendants Giannola Masonry Company, Antonino Giannola, Patricia Andromachi Giannola, and Michele Biundo are Bound by the Indemnity Agreement.**

Count I of Hanover's First Amended Complaint seeks judgment against the Indemnitors, jointly and severally, based upon breach of contract.  Antonino and Patricia do not dispute that they signed the Indemnity Agreement in their individual capacity and Antonino also as the President of Giannola.   In addition, Patricia testified to the authenticity of both hers and Antonino's signatures.  (Dep. Patricia, pp. 24-25).  Michele withdrew his defense that he did not sign the Indemnity Agreement.   (Stipulation to Admission of Facts, Entry of Preliminary Injunction Order and Amendment of Pleadings, December 17, 2009).   Therefore, these Defendants are bound by the Indemnity Agreement.

2.    **The Evidence Shows that Maria Biundo Permitted her Husband, Michele Biundo, to Sign her Name to the Indemnity Agreement.**

One spouse may give the other spouse special authority to sign his or her name to certain documents.  *Beard v. Hill*, 131 Mich. 246, 250; 90 N.W. 1065 (1902).  "The contract of the husband is binding upon the wife whenever he is shown to have been invested with the power of a general agent with regard to the management of the property or the subject matter of the

contract.'" *Wentworth v. Process Installations, Inc.*, 122 Mich. App. 452, 462; 333 N.W.2d 78 (1983) (quoting *Schram v. Burt*, 111 F.2d 557, 562 (6th Cir. 1940)).

For example, in *Hatch v. Wolack*, 316 Mich. 258, 263; 25 N.W.2d 191 (1946), the court stated that the wife could not plead the statute of frauds if she knew of her husband's business, knew that her husband held himself out as the sole owner of their entireties property to prospective purchasers, and consented to the conveyances of those properties. In *Wentworth*, 122 Mich. App. at 460-461, the husband and wife owned commercial property as tenants by the entirety. The trial court found that a lease for the property signed by the husband but not the wife was binding upon the wife. *Id*. at 461. The Court of Appeals affirmed, stating, "[B]ecause Mr. Wentworth was the general agent for Mrs. Wentworth, who admittedly knew nothing about the business and acquiesced in all of her husband's business decisions, the trial court correctly concluded that the lease and option were valid." *Id*. at 462. In *Le Gere v. New Millenium Homes, Inc.*, No. 242473, 2003 Mich. App. LEXIS 3416, at *1 (2003), the husband signed a purchase agreement and a retail installment sales contract for a mobile home that contained arbitration provisions. Because the evidence indicated that the wife assented to the agreements, the court held that she was bound by the arbitration provisions even though she did not sign either agreement. *Id*. at 18.

The parties stipulated that Maria did not sign the Indemnity Agreement. (Stipulation to Admission of Facts, Entry of Preliminary Injunction Order and Amendment of Pleadings, December 17, 2009). Maria testified that she did not know who signed her name to the Indemnity Agreement but denied that she gave Michele authorization to do it. (Dep. Maria, p. 19). Michele claimed that he had never seen the Indemnity Agreement before this lawsuit and did not know who signed Maria's name to the Indemnity Agreement. (*Id*., pp. 12, 14). Maria

denied ever giving her husband a power of attorney to sign her name and also denied that her husband ever signed her name to legal documents.  (Dep. Maria, pp. 12, 19).  However, on March 11, 1999, Maria executed a general power of attorney in favor of Michele that remained in effect until November 1, 2006, when it was replaced by a new general durable power of attorney.  (**Exhibit W**, General Power of Attorney, March 11, 1999; **Exhibit X**, General Durable Power of Attorney, November 1, 2006).

The general power of attorney that was in effect on the date that the Indemnity Agreement was signed contains the following opening paragraph:

> I, **MARIA R. BIUNDO** (sometimes referred to hereafter as "the Principal"), herby appoint **MICHELE BIUNDO**, as my attorney-in-fact, with full power of substitution, to act generally for me, in my name and on my behalf in all business and personal matters in which I may be interested, as fully as if I were personally present.

(**Exhibit W**, p. 1).  The power of attorney also authorizes Michele to engage in some specific acts on Maria's behalf:

> **Documents**. To sign, seal, endorse, execute, acknowledge, record and deliver such agreements, affidavits, bills of sale, deeds, leases, mortgages, bonds, notes, receipts, releases, debt, lien and/or judgment satisfactions, journal entries, certificates and other instruments and/or amendments to instruments as may be necessary, proper or convenient; and to reform documents signed by me (other than wills), to correct typographical errors therein or to harmonize them with changes in law.

(**Exhibit W**, p. 3 ¶ 18).   The power of attorney also specifically provides that third parties dealing with Maria's attorney-in-fact may rely on this power.  (**Exhibit W**, p. 5).

In *Penske Truck Leasing, L.P. v. Kinnie-Annex Cartage Co.*, No. 05-70748, 2006 U.S. Dist. LEXIS 14489, at *9 (E.D. Mich. March 15, 2006), Ronald Kinnie received a general power of attorney from the defendant company that gave him the power to enter into binding contracts on the company's behalf.  Kinnie signed a Guarantor Agreement in favor of the plaintiff that listed the defendant as a guarantor on a lease between a third party and the plaintiff.  *Id*. at *3-5.

When the third party failed to fulfill its obligations under the lease, the plaintiff filed suit against the defendant under the Guarantor Agreement.  *Id*. at *6-7.  The district court held that the general power of attorney authorized Kinney to execute the Guarantor Agreement.  *Id*. at *12.

Here, Michele received a general power of attorney from Maria that gives him the power to act on her behalf in all business and personal matters, to conduct business in her name, and to sign documents on her behalf.  There is no limitation to this power.  If Michele signed Maria's name to the Indemnity Agreement, he was authorized to do so under the power of attorney, and she is bound by his action.  Hanover relied on that signature when it issued the bonds.

The documentary evidence shows a pattern of Michele signing Maria's name.  There is a signature for Maria on **Exhibits M, N, O**, and **P**.  The Biundos deny that any of these signatures are Maria's but do not dispute Michele's signatures on these documents.  (Dep. Maria, pp. 9-12; Dep. Michele, pp. 11-12, 15-16).  **Exhibits N** and **O** are documents that only involve Michele and Maria and do not have the Giannolas listed anywhere.  Patricia testified that she and Maria had to sign documents for bonding companies and banks on occasion, although she could not recall ever seeing Maria sign anything at the office.  (Dep. Patricia, p. 25).  Michele agreed that the bank required Maria and Patricia to sign documents.  (Dep. Michele, p. 11).  Michele testified that he did not take documents home from work to have Maria sign and then bring them back.  (Dep. Michele, pp. 9-10).  Maria has denied that any signature on any of the bank documents is hers, and Michele denied taking them home for her to sign.  Taking this last testimony by the Biundos as truthful, there is a reasonable inference that Michele signed Maria's name to the documents.

There are further gaps in Maria's testimony that put her credibility in question.  Maria testified that she did not have a corporate credit card or access to the use of a corporate credit

card.  (Dep. Maria, p. 8).  However, the evidence shows that there was a corporate credit card issued in Maria's name that was still being used in July 2009.  (**Exhibit Y**, Bank of America Business Cardholder Statement, July 11, 2009).  Maria testified that she did not have a company cell phone or the use of a company cell phone.  (Dep. Maria, pp. 8-9).  However, the evidence shows that Maria had a cell phone under the company's business share plan.  (**Exhibit Z**, Verizon Wireless Statement, October 6, 2009).  Maria testified that she never received money from Giannola.  (Dep. Maria, p. 9).  However, from December 2007 through March 2008, she received three checks from Giannola's payroll account totaling $1,916.97.  (**Exhibit AA**, Copies of Checks from Community Central Bank).

The Biundos' deposition testimony is not credible.  Like the spouses in *Hatch* and *Le Gere*, Maria had some knowledge of her husband's business, as shown by her company credit card and cell phone, and the receipt of checks from the payroll account.  Like the spouses in *Hatch*, *Wentworth*, and *Le Gere*, the evidence here shows that Maria acquiesced in her husband's business decisions and allowed him to sign her name to documents that required her signature.  Michele had the authority to do so under a general power of attorney.  Maria's plea of ignorance is not believable, and she is bound by the signature on the Indemnity Agreement.

### 3.    The Indemnity Agreement Applies to the Bonds at Issue.

Antonino signed both the performance and payment bonds for the Kment Project on June 13, 2008.  (**Exhibit C**).  Antonino signed the payment bond for the Delta Dental Project, and Patricia signed the performance bond on July 25, 2008.  (**Exhibit B**).  Patricia signed all the bonds for the Simpson and Bobcean Projects on July 25, 2008.  (**Exhibit D**; **Exhibit E**).  The Biundos have claimed that they are not bound by the bonds that Patricia signed because she did not have the authority to sign on behalf of the company.

"Under fundamental agency law, a principal is bound by an agent's actions within the agent's actual or apparent authority." *James v. Alberts*, 464 Mich. 12, 15; 626 N.W.2d 158 (2001) (citations omitted).  An agent is a business representative whose function is "'to bring about, modify, affect, accept performance of, or terminate contractual obligations'" between the principal and third parties.  *St. Clair Intermediate School District v. Intermediate Educ. Ass'n/Michigan Educ. Ass'n*, 458 Mich. 540, 557; 581 N.W.2d 707 (1998) (quoting *Saums v. Parfet*, 270 Mich. 165, 172; 258 N.W. 235 (1935)).  Apparent authority must be established by the acts and conduct of the principal, not the agent.  *Meretta v. Peach*, 195 Mich. App. 695, 699; 491 N.W.2d 278 (1992).  Agency by estoppel may be created where acts and appearances lead a third party to believe an agency relationship has been created, and that third party relies on that appearance.  *Revitzer v. Trenton Med. Ctr., Inc.*, 118 Mich. App. 169, 173-174; 324 N.W.2d 561 (1982).

The two fundamental requirements for the existence of an agency relationship are: (1) that the parties consented to its creation, and (2) that the principal has the right to control the agent's conduct and actions.  *Persinger v. Holst*, 248 Mich. App. 499, 504-505; 639 N.W.2d 594 (2001).  Agency between the principal and agent is a matter of mutual consent.  *Revitzer*, 118 Mich. App. at 173 (quoting 3 Am Jur 2d, Agency, § 19).  The Michigan Supreme Court has stated:

> Whenever a principal has placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of the principal the particular act, and such particular act has been performed, the principal is estopped from denying the agent's authority to perform it.

*Maryland Casualty Co. v. Moon*, 231 Mich. 56, 62; 203 N.W. 885 (1925) (quoting 21 R.C.L. p. 856, § 34).

Where an agent exceeds his actual or apparent authority, his act may still bind the principal if the principal ratifies it. *David v. Serges*, 373 Mich. 442, 443-444; 129 N.W.2d 882 (1964). A principal ratifies an act if it treats the unauthorized act as authorized or engages in conduct justifiable only if the principal had authorized the act. *David*, 373 Mich. at 444-445 (citing the Restatement of Agency (2d), § 82). *See, also*, *Hutton v. Roberts*, 182 Mich. App. 153, 162; 451 N.W.2d 536 (1989) ("Even if unauthorized, acts of an agent are ratified by the principal if the latter accepts the benefits of the unauthorized acts with knowledge of the material facts.").

The evidence shows that Patricia had actual authority to sign bonds on behalf of the company. The President of the company testified that Patricia had the authority to sign bonds. (Dep. Antonino, p. 6). Antonino discussed Patricia's authority to sign documents with Michele, and he agreed that she was able to sign when Michele was not available. (Dep. Antonino, p. 7). At the very least, Patricia had apparent authority to sign the bonds. She signed numerous documents throughout her years with the company as the Controller, including warranties, an annual report, lien waivers, sworn statements for pay applications, and bonds. (**Exhibit H**, 2001 Annual Report; **Exhibit I**, Waivers of Liens; **Exhibit J**, Sworn Statements; **Exhibit BB**, Warranty, March 19, 1999; Dep. Patricia, pp. 7-12; Dep. Antonino, pp. 7-8). According to the documents in the underwriting file, Antonino, Michele, and Patricia first met with an agent from Hanover regarding possible bonding, and Patricia became the primary person with whom Hanover communicated. (**Exhibit CC**, Memorandum and Letters from Underwriting File). Patricia spoke with someone from Hanover after a claim was filed on the Delta Dental Project by Grand Blanc Cement. (**Exhibit K** at ¶ 9; Dep. Patricia, pp. 26-27). Hanover reasonably believed that Patricia had the authority to sign bonds on behalf of Giannola.

Even assuming arguendo Patricia exceeded her authority in signing the bonds, Giannola

ratified her actions and received a benefit from the bonds. Consistent with the requirement of its contract, Giannola sought payment and performance bonds from Hanover on the Delta Dental Project. Consistent with the bonding requirements for public construction projects, Giannola sought payment and performance bonds from Hanover on the Kment, Bobcean, and Simpson Projects. After obtaining the Bonds, Giannola began work on all four projects. Its actions demonstrate that it treated the execution of the bonds as authorized, and the company is therefore bound by the bonds. As Vice President of the company, Michele was still working at Giannola in November 2008, well after the Bonds were issued, and never challenged them. (Dep. Patricia, pp. 52-56).[1] Hanover justifiably relied on Patricia's authority to sign the bonds, and Michele is estopped from denying their validity now. *Maryland Casualty*, 231 Mich. at 62.

Furthermore, courts have held that technical defects do not nullify bonds. For example, in *The Hanover Ins. Co. v. Smith*, 137 Ill. 2d 304, 309-310; 561 N.E.2d 14 (1990), the court held that an indemnitor was liable even though the appeal bond executed as a result of the Indemnity Agreement was determined to be a nullity due to a procedural defect. The court stated that receipt of the benefits of the bond constituted sufficient consideration for its enforcement despite the legal insufficiency. *Id*. at 310-311.

---

[1] Michele could also have terminated his liability before execution of the Bonds. Paragraph 21 of the Indemnity Agreement provides:

> This Agreement may be terminated as to any Indemnitor upon 20 days' written notice sent by registered or certified mail to the Surety at its principal bond office . . . but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the bonds that may have been executed prior to such termination.

**Exhibit A**. None of the Indemnitors chose to terminate their liability under the Indemnity Agreement at any time.

In *Richard L. Bowen & Assoc., Inc. v. 1200 West Ninth Street Ltd. Partnership*, 107 Ohio App. 3d 750, 751; 669 N.E.2d 500 (1995), the court held that a supersedeas bond that was executed by the surety but not signed by the principal was still enforceable.  The court stated that a defective bond may still be enforceable at common law under a contract or estoppel theory.  *Id.* at 754.  Additionally, a defective bond is enforceable against the surety if the parties received the benefits of the bond.  *Id.* (citing Restatement of the Law, Security (1941) 522, Defective Judicial Bond, Section 188).  The court also held that the principal's failure to sign the bond did not render it unenforceable.  *Id.* at 755.  In *United States v. United Pacific Ins. Co.*, 697 F. Supp. 378, 380 (D. Idaho, 1988), the indemnitor claimed that his purported signature on the bond was a forgery and argued that he was not bound by the bond.  The court held that the indemnitor could not escape liability because he signed the Indemnity Agreement.  *Id.* at 381.

Here, Giannola and Michele Biundo, as Vice President of Giannola, received the benefit of the Bonds.  Michele signed the Indemnity Agreement for the Biundos, and they cannot escape liability by claiming a technical defect in the Bonds.  As a result of having issued the Bonds, Hanover has made payment for claims totaling $218,041.43, out of claims totaling $623,554.66 to date.  In accordance with the unambiguous terms of the Indemnity Agreement, there is no genuine issue of material fact that the Indemnitors are required to indemnify and hold Hanover harmless and to place with Hanover funds in an amount deemed necessary by Hanover to secure it from all exposure to liability on the Bonds and related losses Hanover has incurred or may incur.  The Indemnitors have materially breached the Indemnity Agreement by failing to do both of these.

Based on the foregoing, Hanover is entitled to summary judgment against the Indemnitors with respect to Count I, Breach of Contract.  Hanover prays that this Court enter an

order of summary judgment in favor of Hanover and against Indemnitors, jointly and severally, in the amount of $218,041.43, together with interest, costs, expenses and attorney fees, to require the Indemnitors to pay $623,554.66 to Hanover to secure it from all losses and potential liability, and to grant any such other relief as this Court deems just and equitable.  Because the amounts set forth above are subject to increase as additional claims and/or expenses may be paid in connection with the subject bonds, Hanover reserves its right to obtain judgment in an additional amount.

**C.      Hanover is Entitled to Summary Judgment Against the Indemnitors with Respect to Count II, Exoneration and *Quia Timet*.**

Hanover is entitled to the relief sought based on its contractual rights under the terms of the Indemnity Agreement as well as Hanover's common law right of exoneration, which is further supported by the common law remedy known as *quia timet*.  Restatement of Law Third, Suretyship & Guaranty § 21(1)(b), comments *j* and *k*.  Both Michigan courts and courts of other jurisdictions have recognized the right of a surety to file an equitable action in the nature of a bill *quia timet* to compel the principal debtor to exonerate the surety from liability.  For example, the Michigan Supreme Court acknowledged this well-established equitable remedy, stating:

> No principal in equity is more familiar, or more firmly established, than that a surety, after the debt for which he is liable has become due, without paying or being called on to pay it, may file a bill in equity in the nature of a bill *quia timet* to compel the principal debtor to exonerate him from liability by its payment, provided no rights of the creditor are prejudiced thereby.

*Ellus v. Phillips*, 363 Mich. 587, 598; 110 N.W.2d 772 (1961) (*citing* 50 Am. Jur. Suretyship, Section 225).

The principles underlying the granting of relief based upon the bill *quia timet* rest on the theory that the surety on a bond is only secondarily liable for the debt secured by the bond, and, therefore, should not have to face the prospect of paying prior to being exonerated.  *Milwaukie*

*Constr. Co. v. Glenns Falls Ins. Co.*, 367 F.2d 964, 966 (9th Cir. 1966). There, the court explained that a bill *quia timet* compels the principal to indemnify the surety against possible loss where there are reasonable grounds for anticipating that its rights are being jeopardized. *Id.* The surety has the right to eliminate the threat that it could be burdened by a liability for which the principal is primarily liable even before any actual claim has been made upon it, or any payment has been made by it. *T.E. Doster v. Continental Casualty Co.*, 268 Ala. 123, 125-126; 105 So.2d 83, 86 (1958).

Based on the foregoing, Hanover is also entitled to the remedy *quia timet* against Giannola Masonry, where, as here, it appears that the principal is reasonably likely to fail or refuse to perform or to protect the surety from loss. Similarly, pursuant to the Indemnity Agreement, all the Indemnitors owe Hanover the duty of exoneration, which requires the Indemnitors to perform their obligations before Hanover is called upon to perform its obligations under the Bond. Giannola is currently out of business. (Dep. Patricia, p. 22). Giannola is reasonably likely to fail or refuse to perform or to protect Hanover from loss. Hanover's right to injunctive relief in this case is manifest under any of the factors applicable to this analysis.

Therefore, Hanover prays this Court enter an order of summary judgment against Indemnitors, jointly and severally, in the amount of $218,041.43, together with an award for Hanover's costs, expenses and attorney fees, to require all of the foregoing Defendants to pay to Hanover $623,554.66 to protect Hanover from any losses it may sustain because of having furnished the Bonds, and to grant any such other relief as this Court deems just and equitable. Because the amounts set forth above are subject to increase as additional claims and/or expenses may be paid in connection with the subject bonds, Hanover reserves its right to obtain judgment in an additional amount.

**D.    Hanover is Entitled to Summary Judgment Against the Indemnitors with Respect to Count III, Specific Performance of the Indemnity Agreement, and Count V, Declaratory Judgment.**

Hanover as surety and the Indemnitors have validly agreed that the Indemnitors will pay collateral security to Hanover as soon as liability is asserted against Hanover, which security shall be in the amount of the claims against the bond, plus an amount deemed sufficient by Hanover in its sole discretion to indemnify and hold it harmless from and against any loss." (**Exhibit A** at ¶ 3).  Hanover as surety and the Indemnitors have validly agreed that Hanover has a security interest in the collateral of the Indemnitors.  (**Exhibit A** at ¶ 5).  Hanover as surety and the Indemnitors have validly agreed that Hanover has "the exclusive right to adjust, settle, or compromise any claim, demand, suit or any other proceeding arising out of any bond against [Hanover] and/or the Indemnitors, take whatever action it deems appropriate in response thereto, and its determination of whether to defend or settle the same shall be binding and conclusive upon the Indemnitors."  (**Exhibit A** at ¶ 3).

Hanover as surety and the Indemnitors have validly agreed that "all funds due or to become due under any contract secured by a bond, whether in the possession of any Indemnitor or others, are held in trust for the benefit and payment of all obligations incurred in the completion of said contract for which the Surety would be obligated under the bond."  (**Exhibit A** at ¶ 7).  The Indemnitors further agreed that "[t]he trust shall inure for the benefit of [Hanover] for any liability or loss under any bond . . . ."  (**Exhibit A** at ¶ 7).

The Court may make binding declarations of rights in cases of actual controversy.  28 U.S.C. § 2201.  The instant case involves an actual controversy regarding the obligations of the Indemnitors under the Indemnity Agreement.  Therefore, Hanover is entitled to declaratory judgment with respect to the parties' rights under the Indemnity Agreement.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, The Hanover Insurance Company respectfully requests that this Court enter an order granting summary judgment against all the Indemnitors.   For the reasons previously set forth, Hanover is entitled to a declaratory judgment against the Indemnitors and the entry of a judgment declaring all of the following:

A.      That Indemnitors, jointly and severally, are liable to Hanover under the Indemnity Agreement for all losses Hanover incurs as a result of the issuance of the Bonds;

B.      Hanover is granted a judgment for all costs, including attorney and consultant fees incurred as a result of having issued the Bonds, together with an award of interest on all amounts paid by Hanover;

C.      That pursuant to the terms of the Indemnity Agreement, Hanover has the following rights:

1.      Hanover has the right to settle or compromise any claim, liability, demand, suit or judgment upon the Bonds at issue and such settlement or compromise shall be binding on the Indemnitors.  The vouchers or other evidence of payment shall be prima facie evidence of the fact and amount of the Indemnitors' liability;

2.      Hanover has the right to access such information as Hanover requests concerning Indemnitors and/or the activities and property of each, including all books and records maintained or possessed by Indemnitors, and Indemnitors are obligated to provide Hanover such information;

3.      The Indemnitors are obligated to post payment or other collateral in the amount of any claims against the Bonds, including the claims for $623,554.66 by the various suppliers and subcontractors, together with amounts necessary to cover all of Hanover's costs, expenses, and attorney fees.

4.      Each of the Indemnitors is enjoined and restrained from selling, transferring, disposing of, or liening their assets and property and further enjoined and restrained from allowing their assets and property to be liened, unless and until Hanover shall receive the funds requested in paragraph 3 above.

Hanover has incurred attorney fees in the defense and investigation of the claims against the Bonds and in seeking to protect and enforce its rights under the Indemnity Agreement.

Hanover prays this Court enter an order of judgment against Indemnitors, jointly and severally, in the amount of $218,041.43, together with an award for Hanover's costs, expenses and attorney fees, to require all of the foregoing Defendants to pay to Hanover $623,554.66 to protect Hanover from any losses it may sustain because of having furnished the Bonds, and to grant any such other relief as this Court deems just and equitable.  Because the amounts set forth above are subject to increase as additional claims and/or expenses may be paid in connection with the subject bonds, Hanover reserves its right to obtain judgment in an additional amount.

Respectfully submitted,

**KERR, RUSSELL AND WEBER, PLC**

By:  s/Michael D. Carroll_____  _____
    Mark M. Cunningham (P38408)
    Michael D. Carroll (P53815)
    Jacquelyn A.K. Stanyer (P69403)
Attorneys for Plaintiff The Hanover Insurance Company
500 Woodward Ave., Suite 2500
Detroit, MI  48226
(313) 961-0200
mmc@krwlaw.com
mdc@krwlaw.com
Dated:  May 28, 2010    jas@krwlaw.com

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

THE        HANOVER        INSURANCE
COMPANY, a New Hampshire corporation,

        Plaintiff,

v.                                                                   Case No. 2:09-cv-14200-MOB-MKM

GIANNOLA MASONRY CO., a Michigan                Hon. Marianne O. Battani
corporation,   ANTONINO   INDEMNITY
GIANNOLA,   an   individual,   PATRICIA
ANDROMACHI                    INDEMNITY
GIANNOLA,   an   individual,   MICHELE
BIUNDO,   an   individual,   and   MARIA
BIUNDO, an individual,

        Defendants.

---

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2010, I electronically filed the foregoing paper with the Clerk of
the Court using the ECF system which will send notification of such filing to ECF Participants,
and I have mailed a copy via United States Postal Service to Non ECF Participants.

        Respectfully submitted,

        **KERR, RUSSELL AND WEBER, PLC**

        By:  /s/Michael D. Carroll (P53815)
           Mark M. Cunningham (P38408)
           Michael D. Carroll (P53815)
           Jacquelyn A.K. Stanyer (P69403)
        Attorneys for Plaintiff The Hanover Insurance Company
        500 Woodward Ave., Suite 2500
        Detroit, MI  48226
        (313) 961-0200
        mmc@krwlaw.com
        mdc@krwlaw.com
Dated:  May 28, 2010      jas@krwlaw.com